Sherman E. Buis, etc., Respondent, v. The Prudential Insurance Company of America, Appellant.—77 S. W. (2d) 127.

Kansas City Court of Appeals. October 9, 1934.

*Schultz & Owen* for respondent.

*Henry I. Eager, John C. Landis, III, Ralph M. Jones, Ralph W. Hyatt* and *Meservey, Michaels, Blackmar, Newkirk & Eager* for appellant.

REYNOLDS, C.—This case arose in the Circuit Court of Buchanan County. It is a suit by plaintiff against defendant for total and permanent disability, rendering him "wholly, continuously and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value during the remainder of his life," under a disability provision in a certain policy of life insurance issued by defendant to plaintiff in October, 1928.

From an adverse judgment for $1,205 including interest and for $100 penalties for delay and $250 for attorney's fees, defendant, after an unsuccessful motion for a new trial, appeals.

The policy, among other matters, recites as follows:

"PROVISIONS AS TO TOTAL AND PERMANENT DISABILITY: "WAIVER OF PREMIUMS, PAYMENT OF FACE AMOUNT OF INSURANCE.

"Disability Before Age 60: Waiver of Premiums—Payment of Face Amount of Insurance in Instalments.—If the Insured shall become totally and permanently disabled, either physically or mentally, from any cause whatsoever, to such an extent that he (or she) is rendered wholly, continuously and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value during the remainder of his (or her) lifetime, and if such disability shall occur at any time after the payment of the first premium on this Policy, while this Policy is in full force and effect and the Insured is less than sixty years of age, and before any non-forfeiture provision shall become operative, the Company, upon receipt of due proof of such disability, will grant the following benefits:

"(1)  Waiver of Premiums.—The Company will waive the payment of any premium or premiums the due date of which, as specified on the first page hereof, shall occur after receipt by the Company of said proof of such disability.

"(2)  Payment of Face Amount of Insurance in Instalments.— The Company will, in addition to waiving the premiums, pay to the Insured at its Home Office the Face Amount of Insurance hereunder, less any indebtedness under this Policy, in forty quarter-annual instalments during ten years, each instalment to be of the amount of $29.16 per $1,000 of insurance payable. The first payment shall be made immediately upon receipt by the Company of due proof of such disability and subsequent instalments shall be paid quarter-annually thereafter.—

"The total amount of insurance under this Policy, exclusive of the Accidental Death Benefit, at any time after one or more of such instalments have been paid shall not exceed the commuted value of such of said instalments as are not then due computed at the rate of three and one-half per cent per annum compound interest, and loan and non-forfeiture values correspondingly modified shall be available to the Insured irrespective of· said waiver of premiums. Any indebtedness incurred on account of the Policy during the instalment period shall be deducted from the commuted value of the unpaid instalments at that time, computed as above, and the amount of each of such unpaid instalments shall be correspondingly reduced. "Any insurance remaining at the death of the Insured and any disability instalments due and unpaid at that time shall be paid to the Beneficiary or Beneficiaries designated in the Policy.—

"Recognized Disabilities.—Without prejudice to any other cause of disability, the Company will recognize the entire and irrecoverable loss of the sight of both eyes, or loss by severance of both hands above

the wrists, or of both feet above the ankles, or of one hand and one foot, as total and permanent disability·under this Policy, provided the loss of the sight of each of both eyes or the loss of each of such members shall occur while these provisions are in full force and effect.

"The Disability provisions in this Policy are granted without specific extra premium being charged therefor, but the cost thereof is included in the premium for this Policy."

The second amended petition, on which the case was tried, in substance alleges the issuance of the policy; full performance upon plaintiff's part; that in July, 1929, plaintiff was rendered totally and permanently disabled, whereby he is unable to engage in any occupation or perform any work for any kind of compensation during the remainder of his life. It further alleges vexatious refusal to pay on defendant's part and prays judgment for $1000, the full amount of the benefits provided by the terms of the policy, with interest from July, 1929, together with ten per cent penalty and an attorney's fee in the sum of $300.

The answer to the second amended petition set out the various provisions of the policy sued upon and denied the existence of a disability, past or present, of such degree as was contemplated by said policy to be required and further alleged that plaintiff could recover under the provisions of the policy only instalments of $29.16 each three months, after the making of due proof, even if disabled (which disability defendant denied). In addition, such answer tendered a general denial.

It would appear that the insurance payable under said policy, so far as it related to total and permanent disability to one under the age of sixty years, amounted to $1000 to be paid in forty quater-annual installments of $29.16 each.

The evidence tends to show that, on the twenty-third day of August, 1929, during the life of the policy sued upon, the plaintiff was stricken with an acute attack of poliomyelitis, commonly known as infantile paralysis, which rendered him helpless and partially, if not wholly, paralyzed both legs. At the time of the trial, in February, 1933, his condition had somewhat improved, he having regained the use of his left leg; but the right leg was still partially paralyzed; and he was without any substantial use thereof. The muscles thereof had become atrophied; it had shrunk and hardened so that, at the lower part of the thigh, above the knee, it was slightly more than two inches smaller than the left leg and, below the knee, around the calf, more than an inch smaller than the left. The condition thereof impaired its usefulness, making it weak and making plaintiff less able to take muscular exercise or do work. The use of it tended to tire him, not only in said leg but in other parts of the body. This atrophied condition was due to lack of nerve supply, occasioned by an

injured or diseased condition of the nerves. It sprung from an injured or diseased condition of the nerves of the spinal cord directly connecting with the nerves of the leg.

Dr. Dunsmore, of St. Joseph, Missouri, who testified upon the trial that he was an experienced nerve and mental specialist, after describing the physical condition of plaintiff substantially as above indicated, and who had examined plaintiff June 1, 1932, and afterwards, upon the last Saturday and Sunday prior to the trial, in answer to the question asked him whether plaintiff was totally incapacitated from engaging in any substantial manner in any occupation or from performing work in any substantial way, said, "I believe he is substantially impaired from performing work or labor."

Dr. Bloomer, likewise a resident of St. Joseph, Missouri, called as a witness for the defendant, testified that he was a practicing physician and surgeon of St. Joseph, Missouri, of over twenty years' experience; that he examined the plaintiff in December, 1930, and found his right leg atrophied and its use impaired, relatively, to the use of the left leg, about fifty per cent. He testified further that, in his opinion, plaintiff's condition would not grow worse than it was at that time; that it might remain stationary, or it might improve; that the atrophied condition of his right leg was due to an injured condition of his nerves. From the history of plaintiff's case, as he learned it and from the symptoms found, he diagnosed his trouble as poliomyelitis, or infantile paralysis, and stated that, in his opinion, the condition in which he found plaintiff, upon his examination, was permanent and that he would always suffer fatigue from the use of his right leg.

The evidence tends further to show that the plaintiff was about the age of seventeen years at the time the policy was issued and that he had quit school in the seventh grade. Prior to the time he was stricken, he had caddied some on the golf course; had worked a short time in a grocery store; had spent a short while upon a small farm near Sheridan, Missouri, where his mother did the house work and he cut, raked, and burned stalks and also, at times, ran a disc harrow and did odd chores about the place. Prior to his illness, he was husky and strong but had not fitted himself for any special occupation or line of work or had any training, educational or otherwise, to qualify him for any useful occupation.

At the time plaintiff was stricken, he was visiting in St. Joseph. He was unable to get up from his bed for several weeks. As soon as his condition permitted, he was removed to his home near Sheridan, where he has since resided with his mother. For six months after he was able to get up, he could move about only upon crutches; he had scarcely any use of his legs; he gradually regained the use of the left leg so that, eventually, he was able to get around without the use of crutches. He has never regained the use of the right leg;

he is unable to work; the use of his right leg fatigues him so that he cannot run a lawn mower; he cannot engage in the game of basket ball or other like sports; when he undertakes to stand upon both legs, he becomes unsteady and tends to fall. He has endeavored to go to school, and the evidence tends to show that he took the eighth grade in the public school under difficulties. He undertook special courses of instruction but with indifferent success. The work tired him, and he gave it up. He tried to learn typewriting and made so many mistakes he became discouraged and stopped. He is quite a reader, has good intelligence, and assists the librarian of the public school in taking in and handing out books. He walks around town and engages in minor games with other young people. He walked to school several blocks and back home. He walked to the river, about a mile distant, where he engaged in swimming but received no aid from his right leg. He assisted his mother in wiping dishes and bringing in water and fuel and doing other chores about the house. He became subject to bleeding frequently at the nose and to fainting spells followed by loss of memory therefrom and by weakness for some time thereafter. He suffers with headache at practically all times. There was some evidence from some of his teachers at school to the effect that they never noticed anything unusual or abnormal about him or any difficulty in his manner of getting around; others noticed his limp and swinging stride but nothing of an abnormal condition. He did not seem to engage in the sports on the school ground, but watched the other children play. He was some years older than the other pupils in his grade.

There was also some evidence, upon the part of his neighbors and of boys with whom he played, that he moved about normally; that he engaged in the same sports with the other boys with whom he associated; that he swung by his arms upon the trapeze; that he rode horseback and in motor cars. The evidence, however, was never to the effect that he drove a motor car, but to the contrary; it was never to the effect that he mounted a horse from the ground, but to the contrary; and it tended to show that he could mount a horse only from some position of support, requiring no effort on his part.

The testimony of Dr. Dunsmore was to the effect that, at the time he examined him, he did not present a husky, strong appearance.

There was evidence tending to show that plaintiff had grown despondent over his condition and lacked ambition on account thereof.

The policy named Mrs. Ina G. Buis, plaintiff's mother, as beneficiary upon the death of plaintiff and was issued to plaintiff in consideration of a premium to be paid defendant in the sum of $2.56 per month. This premium appears to have been paid until as late as some time during the year of 1932; and, after this, suit was brought.

Plaintiff also appears to have submitted proofs of his disability to defendant within the time required by the terms of the policy—

about January 6, 1930, and again about December 30, 1930, and perhaps at other times—on blanks furnished for that purpose by defendant and to have made application for disability benefits under the policy sued upon. These proofs consisted of statements by himself and physicians who attended or examined him, describing his condition and, in instances, giving the opinions of his physicians as to his disability and to the extent thereof and whether his disabilities were total and permanent or otherwise.

Just what, if any, objection the defendant had or made to such application and proofs submitted, prior to the filing of its answer herein, does not appear from the record. It does not appear that it ever accepted or rejected the same, other than as indicated by its answer and its failure to make some settlement.

Upon a trial before the court and a jury, the judgment appealed from was rendered. At the close of plaintiff's case and again at the close of the whole evidence, defendant requested instructions directing a verdict for it, which were by the court denied.

## Opinion.

The defendant contends that its instructions for a directed verdict should have been given and that the court committed error in refusing them. The defendant, having offered evidence in support of its answer, upon the refusal of the court to grant its instruction at the close of the plaintiff's case, waived its right to insist upon error upon the part of the court in refusing to give the same.

The complaint relating to the action of the court in refusing its instruction for a directed verdict at the close of the whole evidence is, however, for review. It is contended under this head that the evidence failed to show that plaintiff was totally and permanently disabled within the provisions and meaning of the policy in suit but that, upon the contrary, the evidence showed that he was not so disabled.

This contention involves the construction of the following clause in the policy, to-wit: "If the Insured shall become totally and permanently disabled, either physically or mentally, from any cause whatsoever, to such an extent that he (or she) is rendered wholly, continuously and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value during the remainder of his (or her) lifetime—"

The defendant contends that, by the terms "totally and permanently disabled" as used therein, the insured must have been rendered substantially helpless and reduced to a condition analogous to death and thereby wholly disabled from performing any work or labor or engaging in any occupation. However, the words "wholly, continuously and permanently unable to engage in any occupation or perform any work" are qualified by the words following "for any kind of compensation of financial value during the remainder

of his (or her) lifetime," so as to preclude the construction contended for. The insured, by such qualification, is required to be disabled only to such an extent that he may not engage in some occupation or perform some work and labor for compensation of financial value. One might not be disabled from doing unimportant and minor acts of work and labor and yet be disabled from engaging in a gainful occupation or from the performance of work and labor of a character from which compensation of a financial value might be exacted or derived.

Again, what is and what is not a "total disability" within the meaning of the policy is a relative question, depending upon the attainments of the insured and his ability to employ himself in one occupation or another. A physical ailment which would render an illiterate laboring man totally unfit to do or perform work and labor in a substantial way, so as to earn a livelihood therefrom, might not prevent a lawyer or a physician from practicing his profession or a college professor or president from pursuing his vocation or a president of a corporation from pursuing his work or take from them all other chances of earning a living in some vocation other than one involving physical work and labor. Therefore, in determining the liability in this case, both the mental and physical capabilities of the insured must be considered. Otherwise, the policy becomes a mere delusion and a snare. [McMahon v. Supreme Council, Order of Chosen Friends, 54 Mo. App. 468, l. c. 472.] When the language of the policy is the very broadest, it is, nevertheless, held to be used with reference to the lot in life of the insured, his vocation and capacity. [Wall v. Continental Casualty Company, 111 Mo. App. 504, 86 S. W. 491, l. c. 498.]

In the case of Katz v. Union Central Life Insurance Company, 44 S. W. (2d) 250, it was said, " '—where the insured is incapacitated from performing any substantial part of his ordinary duties a case of total disability is presented, although he is still able to perform a few minor duties.' [1 C. J., p. 463, sec. 163.]"

When the insured is unable, by reason of his injuries, to do and perform the substantial acts required of him in his employment or business, he is totally disabled within the meaning of the policy, regardless of the fact that he will be able occasionally to perform some single act or acts connected with his business or to perform numerous minor and inconsequent acts. The insured is "totally disabled" when he is unable to perform the substantial acts of his employment or business in a way to reap financial value therefrom, as these words used in the policy in question contemplate. [Katz v. Union Central Life Insurance Co., supra; 1 C. J., p. 464, sec. 164.]

" '—the question whether the insured is disabled from prosecuting some other occupation is to be determined by a consideration of his

education, experience, age, and natural ability.' [1 C. J., p. 465, sec. 167.]'' [Katz v. Union Central Life Insurance Co., supra.]

The policy in suit does not limit the insured to any special line of business or employment, and it is to be construed in the light of the facts that must have been known to both the plaintiff and the defendant at the time it was issued. Defendant insured plaintiff, knowing that he was a mere boy of seventeen years of age with a limited and unfinished education and without having qualified himself for a professional, literary, or business career other, at least, than one depending upon work and labor. So, taking the plaintiff as he was when the policy was issued, if, from his injuries and his condition as shown by the evidence, he is totally and permanently incapacitated from earning a livelihood from work and labor, defendant may not avoid liability because of the mere possibility that, by education or otherwise, he may, at some time in the future, become able to earn a living in some way or by some means not then available. [Indiana Life Endowment Company v. Reed, 103 N. E. 77, 1. c. 83.] That he is so totally disabled, we think is abundantly shown from the competent evidence in the record. That his injuries and disabled condition is permanent is likewise shown by the record. That he might, by education or other training, fit himself for some employment or calling is entirely speculative and problematical and is incapable of being shown with certainty. So far as the record tends, that he will so become fitted is negatived. At the age of seventeen, under normal conditions, he had finished only the seventh grade in the public schools and, since his injury, has made the eighth grade with difficulty; and his attempts at special courses have met with indifferent success. While the evidence tends to show that he may be mentally normal, yet he is afflicted with continuous headaches, with fainting spells causing temporary loss of memory, and is despondent on account of his condition and unable to assert ambition and ability. He is unable to perform substantial acts in any employment for which he might receive compensation of a financial value, by reason of his physical condition, and can perform only most inconsequent acts in an unsubstantial way. The evidence in the record indicates that he is in both a mental and physical condition from which there is no present prospect of relief, which wholly unfits and prevents him from substantial effort and service in any line of employment for which compensation of a financial value might be realized.

While the plaintiff must show not only that he has been wholly disabled for the length of time required by the policy and is now so disabled as to prevent his employment at work and labor affording compensation of a financial value or in other gainful occupation but that he will continue to be so at all times during the future, yet the latter is shown, if it be made to appear that, very likely or in all human

probability, so far as things look now, he will remain so wholly disabled. [Paul v. Missouri State Life Ins. Co., 52 S. W. (2d) 437.] He is not required to make absolute proof of the latter for the reason that, in the nature of things, such proof is rarely, if ever, possible.

Tested by the general rules mentioned, it is clear that the evidence in the record made a case for submission to the jury and that the court did not err in refusing defendant's requested instruction for a directed verdict at the close of the whole evidence.

That the policy in suit is primarily one of life insurance, the benefit thereunder payable upon the death of plaintiff in a stipulated sum of one thousand dollars, which sum, in the event of permanent and total disability, is to be paid as a disability benefit to the insured in equal quarterly installments during the period of ten years, reducing the amount thus agreed to be paid in the event of death by the amount of the installments thus paid, until after ten years, when all liability under the policy, either as a life or disability policy, stands discharged, does not alter the meaning of the words "total and permanent disability" as used therein from the meaning ordinarily given such words where found in insurance contracts, the same as or similar to the clause in question and as outlined in the above rule. To give to such words the full meaning contended for by defendant would be to reduce to a nullity the contract so far as it relates to disability and to make the provisions relating thereto a mere scheme for the inducement of the policy and a means of extracting dues from policyholders without creating any real liability for the disability features thereof. The policy does not provide that the disability benefits agreed to be paid are mere gratuities, but it expressly recites that the cost of such insurance is included in the general premium for the policy. As was further said in the case of Foglesong v. Modern Brotherhood of America, 121 Mo. App. 548, 97 S. W. 240, "Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental inertia. We have examples of persons without hearing and without sight following a vocation— some without feet, and some without hands, engaged in business. The achievements of disabled persons are seemingly marvelous. Under defendant's theory, the plaintiff might embark in the peanut trade or follow the business of selling shoestrings or lead pencils, or follow some similar calling, in which instances, under the rule invoked, there would be no disability within the meaning of the policy. In our opinion, such was not within the contemplation of the parties." Neither was such result within the contemplation of the parties here. If it was so intended by the defendant, the policy amounts but to a mere fraud.

So far as defendant's contention that plaintiff is not mentally disabled but is mentally alert and that he is therefore not totally disabled is concerned, it may be said that the policy itself contemplates that the insured may become totally and permanently disabled by reason of either a mental or a physical affliction. It so recites. One can be totally and permanently disabled from physical injury and remain mentally alert and capable and yet be unable, on account of his physical condition, to engage in any occupation or perform work and labor from which compensation of a financial value might be derived.

If ability to mount a horse as a cripple, from a support like a manger, or swing by the arms from a trapeze or swim with the aid of two arms and one leg or play at minor games or walk about town with a dead leg for a little exercise or dry table dishes or bring in a bucket of water or a stick of wood at times constitutes substantial acts in the performance of work and labor in any employment or occupation for which one might expect or receive compensation of financial value, then we must confess that this world is entirely different from what it has always been considered.

Plaintiff's disability as it appears from the record is wholly within the provisions of the policy sued upon and as contemplated by the parties.

It, however, appears that plaintiff was permitted to recover the full face value of the policy in the sum of $1000 as a gross sum, together with interest thereon. This he was not entitled to do. He could recover only for the unpaid installments following the proofs of loss due at the time the petition was filed or, at most, under proper amended pleadings, for the amount of such unpaid installments due at the time of the trial. His proofs of disability appear to have been made about January, 1930, and December, 1930. This suit was filed in September, 1931, and trial was had and judgment rendered at the January term, 1933. The policy provided that, in the event of total disability, defendant should pay the face value thereof in the sum of $1000 in quarterly installments of $29.16 each during a period of ten years. This thus became, within the contemplation of the contracting parties, the ultimate liability of the defendant, to pay said sum in quarterly installments, whether based upon its denial of liability or otherwise. Upon the authority of the case of Allen v. National Life & Accident Insurance Company (Mo. App.), 67 S. W. (2d) 534, the opinion in which was written by Judge BLAND of this court, and of the cases therein cited, and upon authority of the case of Puckett v. National Annuity Association, 134 Mo. App. 501, 114 S. W. 1039, and of the case of Leon v. Barnsdall Zinc Company, 309 Mo. 276, 274 S. W. 699, the judgment in this case cannot stand. This case is one wherein the plaintiff appears to have performed his contract in full, and the contract upon the part of the defendant only is executory.

Numerous other errors upon the trial are urged by defendant in its brief. However, without committing ourselves upon the matters complained of, we do not pass upon the same for the reason that it is unnecessary to do so upon this appeal, inasmuch as the judgment below must be reversed on account of the error in the judgment noted. The judgment is therefore reversed, and the cause is remanded for a new trial in conformity with the views expressed herein. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of REYNOLDS, C., is adopted as the opinion of the court. The judgment is reversed, and the cause remanded for new trial. All concur.